UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

PAUL KOREN,

        **Plaintiff,**

                                **Case No. 1:21-cv-9**

      **v.**                      **JUDGE DOUGLAS R. COLE**

JIM NEIL, et al.,

        **Defendants.**

## OPINION AND ORDER

This cause comes before the Court on Defendants NaphCare, Inc. ("NaphCare"), Katrina Hale, Mark Taylor, and Darlene Graham's (collectively "NaphCare Defendants") Motion to Dismiss under Fed. R. Civ. P. 12(b)(6) ("12(b)(6) Mot.," Doc. 3), filed March 11, 2021. Plaintiff Paul Koren filed his Opposition ("12(b)(6) Opp'n," Doc. 11) on April 14, 2021, and the NaphCare Defendants filed a Reply ("12(b)(6) Reply," Doc. 13) on May 12, 2021.

Also before the Court is Defendants Jim Neil and Mark Schoonover's (collectively "County Defendants") Motion for Judgment on the Pleadings under Fed. R. Civ. P. 12(c) ("12(c) Mot.," Doc. 14), filed on June 17, 2021. Koren filed his Opposition ("12(c) Opp'n," Doc. 16) on August 9, 2021, and the County Defendants filed a Reply ("12(c) Reply," Doc. 17) on August 27, 2021.

For the reasons stated more fully below, the Court **GRANTS** the NaphCare Defendants' Motion to Dismiss (Doc. 3) and accordingly **DISMISSES** all claims against Katrina Hale, Mark Taylor, Darlene Graham, and NaphCare **WITHOUT PREJUDICE**. Further, the Court **GRANTS** the County Defendants' Motion for

Judgment on the Pleadings (Doc. 14) and **DISMISSES** all official and individual capacity claims against Jim Neil and Mark Schoonover **WITHOUT PREJUDICE**.

## BACKGROUND

In deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6), or a motion for judgment on the pleadings under Fed. R. Civ. P. 12(c), the Court accepts as true the factual allegations in the Complaint. Thus, the Court reports, and relies on, those allegations here, but with the disclaimer that these facts are not yet established, and may never be.

Koren is a seventy-year-old retiree. (Compl., Doc. 1, #5[1]). In the early morning hours of January 7, 2019, he was attacked in his home by armed assailants seeking to rob him. (*Id.* at #11). Law enforcement officials responded and arrested several of the assailants. (*Id.*). While they were still in Koren's home, however, the law enforcement officials discovered marijuana plants and subsequently arrested Koren as well. (*Id.*).

After arresting Koren, the law enforcement officials took him to the Hamilton County Justice Center ("HCJC") in Cincinnati, Ohio. (*Id.*). While in the jail's intake area, Koren states that he "was concerned that he was being taken to the same facility as the men who had just broken into his home and attacked him." (*Id.*). After "voic[ing] his safety concerns" within earshot of several of the jail's intake officers, Koren states that they "deemed [him] to be exhibiting 'disorderly' behavior," and "claimed that [he] refused to submit to a strip search." (*Id.* at #11–12). Several of the

---

[1] Refers to PageID #.

intake officers then "grabbed Mr. Koren, picked him up, and forcibly slammed him into a restraint chair where he was then bound at the wrists and ankles." (*Id.* at #12).

The intake officers then informed Defendant Nurse Graham, a NaphCare employee who provided medical services at HCJC, (*id.* at #10), that Koren had been "placed in the restraint chair because he refuse[d] to submit to a strip search for drugs." (*Id.* at #12). Nurse Graham consented to have Koren wheeled in the restraint chair to the jail's psychiatric area. (*Id.*).

After he arrived in the jail's psychiatric area, Koren continued to be held in the restraint chair. (*Id.* at #13). During this time, Koren states that multiple NaphCare employees monitored and cared for him, including Defendants Nurse Hale, Medic Taylor, and several other John/Jane Doe medical professionals. (*Id.* at #13–14). While monitoring Koren, Nurse Hale, Medic Taylor, and a John/Jane Doe medical professional each allegedly noted that Koren was "alert, responsive to questions, pleasant, and relaxed." (*Id.*). Nonetheless, while in the chair, Koren "was not allowed any opportunity to stand, stretch, or exercise his limbs," nor was he allowed to use the restroom. (*Id.* at #13). Consequently, Koren was "forced to urinate upon himself and then sit in his own waste for hours." (*Id.*).

After being held in the jail's psychiatric area for a few hours,[2] Koren "was wheeled back to the intake area still in the restraint chair[,] from which he was ultimately released." (*Id.* at #15). In total, he had spent nearly five hours in the

---

[2] Although Koren alleges that he was held in the restraint chair for nearly five hours total, (Compl., Doc. 1, #13), it is not clear from his Complaint how much of that time was spent in the jail's psychiatric area.

restraint chair. (*Id.* at #5). Koren states that, after he was released, no one either requested or performed a strip search. (*Id.* at #15). He was then held in the HCJC until he was able to see a judge on the morning of January 8, 2019, at which point he arranged for his bail and release. (*Id.*).

After his release, Koren filed a complaint with the Hamilton County Sheriff's Department regarding his detention in the restraint chair. (*Id.*). The Department's Internal Affairs Section ("Internal Affairs") reviewed that complaint and concluded that the "use of the restraint chair during this incident was within the guidelines of the Hamilton County Policy and Procedure." (*Id.*).

At the times relevant here, Defendant Jim Neil was the Hamilton County Sheriff, (*id.* at #6), and defendant Mark Schoonover was his Chief Deputy Sheriff in charge of HCJC operations. (*Id.* at #9). After Internal Affairs issued its report detailing the results of its investigation, Koren states that Neil and Schoonover "adopted and ratified" the investigation's conclusions. (*Id.* at #15).

Koren also alleges that the events of January 7 were not an isolated incident. Rather, he states that this incident resulted from customs or policies instituted by then-Sheriff Neil regarding the use of restraint chairs and strip searches "which were deliberately indifferent to the rights of individuals such as Mr. Koren." (*Id.* at #15–17). Further, Koren states "[p]ublic records reveal that hundreds of citizens every year are placed in a restraint chair in the HCJC in much the same manner as Mr. Koren. Most of these citizens were deemed to have been nothing more than 'uncooperative.'" (*Id.* at #16).

4

On January 6, 2021, Koren initiated the instant lawsuit, asserting claims for excessive force under 42 U.S.C. § 1983 against various actors allegedly involved in his confinement in the restraint chair. (*Id.* at #17). Relevant for the purposes of this Opinion, Koren brings claims against Nurse Hale, Medic Taylor, and Nurse Graham (collectively, "the individual NaphCare Defendants") for their role in his confinement, as well as a *Monell* claim[3] against their employer, NaphCare. Koren also asserts § 1983 claims against former Hamilton County Sheriff Jim Neil and former Chief Deputy Sheriff Mark Schoonover in both their individual and official capacities.[4]

On March 11, 2021, the NaphCare Defendants filed their Motion to Dismiss under Fed. R. Civ. P. 12(b)(6). (Doc. 3). The County Defendants followed suit on June 17, 2021, when they filed their Motion for Judgment on the Pleadings under Fed. R. Civ. P. 12(c). (Doc. 14).

## LEGAL STANDARD

Although the NaphCare Defendants move under Fed. R. Civ. P. 12(b)(6) and the County Defendants move under Fed. R. Civ. P. 12(c), the Court analyzes both motions using the same legal standard. *Mellentine v. Ameriquest Mortg. Co.*, 515 F.

---

[3] A *Monell* claim allows a plaintiff to bring a § 1983 action directly against local government entities and private corporations, provided certain conditions are met. *Rudd v. City of Norton Shores*, 977 F.3d 503, 520 (6th Cir. 2020).

[4] Koren's Complaint expressly states that Neil "is sued in both his individual and official capacities." (Doc. 1, #6). With regard to Schoonover, Koren's Complaint does not expressly state whether his claims against Schoonover are official capacity, individual capacity, or both. However, both the County Defendants' Motion for Judgment on the Pleadings and Koren's Opposition appear to assume that Koren names Schoonover in both official and individual capacities. (12(c) Mot., Doc. 14, #104; 12(c) Opp'n, Doc. 16, #124). Accordingly, the Court construes Koren's Complaint as stating both official and individual capacity claims against Schoonover.

App'x 419, 423 (6th Cir. 2013). At the pleadings stage, a complaint must "state[] a claim for relief that is plausible, when measured against the elements" of a claim. *Darby v. Childvine, Inc.*, 964 F.3d 440, 444 (6th Cir. 2020) (citing *Binno v. Am. Bar Ass'n*, 826 F.3d 338, 345–46 (6th Cir. 2016)). "To survive a motion to dismiss [or motion for judgment on the pleadings], in other words, [Koren] must make sufficient factual allegations that, taken as true, raise the likelihood of a legal claim that is more than possible, but indeed plausible." *Id.* (citations omitted).

In making that determination, the Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (internal quotation marks omitted). That is so, however, only as to well-pled factual allegations. The Court need not accept "'naked assertions' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (brackets omitted) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). Likewise, the Court need not accept as true any legal conclusions alleged in a complaint; "labels and conclusions" or a "formulaic recitation of the elements of a cause of action" will not suffice. *Id.*

With that in mind, the well-pled facts must be sufficient to "raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555, such that the asserted claim is "plausible on its face." *Iqbal*, 556 U.S. at 678. Under the *Iqbal/Twombly* plausibility standard, courts play an important gatekeeper role, ensuring that claims meet a threshold level of factual plausibility before defendants are subjected to the

potential rigors (and costs) of the discovery process. Discovery, after all, is not meant to allow parties to discover whether a claim in fact exists, but rather to provide a process for gathering evidence to substantiate an already plausibly-stated claim. *Green v. Mason*, 504 F. Supp. 3d 813, 827 (S.D. Ohio 2020).

The Court begins its analysis with the NaphCare Defendants' Motion to Dismiss (Doc. 3), before turning to the County Defendants' Motion for Judgment on the Pleadings (Doc. 14).

## THE NAPHCARE DEFENDANTS' MOTION TO DISMISS

The NaphCare Defendants move to dismiss both Koren's § 1983 excessive force claims against the individual NaphCare Defendants (Nurse Hale, Nurse Graham, and Medic Taylor), as well as Koren's *Monell* claim against NaphCare itself.

Section 1983 does not create any substantive rights. Rather it provides a vehicle for remedying violations of other rights. More specifically, § 1983 allows a party to bring "an action at law, suit in equity, or other proper proceeding for redress," against any "person who, under color of [state law]" deprives the party of any rights "secured by the Constitution and [federal] laws." 42 U.S.C. § 1983. In other words, to succeed in a § 1983 action, the plaintiff must plead facts plausibly showing that a defendant violated a right bestowed on the plaintiff by federal law, and that the defendant did so while acting "under color of" state law.

Because the requirements to bring a cognizable § 1983 claim are different depending on whether the defendant is an individual on the one hand or a corporation

7

or local government entity on the other, the Court addresses the claims against the individual NaphCare Defendants and the claims against NaphCare itself separately.

A.   **Koren's Claims Against The Individual NaphCare Defendants Fail Because Koren Fails To Adequately Allege That They Unreasonably Subjected Him To Confinement In A Restraint Chair.**

First, the individual NaphCare Defendants—Nurse Graham, Nurse Hale, and Medic Taylor—move to dismiss all claims against them. According to Koren's Complaint, Nurse Graham first inspected Koren after he was placed in the restraint chair by the jail's intake officers, and she consented to his transportation to the jail's psychiatric area. (Compl., Doc. 1, #12). Once Koren arrived in the jail's psychiatric area, Nurse Hale and Medic Taylor were among the various medical professionals responsible for monitoring and caring for him. (*Id.* at #13–14). By virtue of each individual's involvement in his confinement in the restraint chair, Koren argues that all three are liable for excessive force under § 1983.

The parties disagree on three key points. First, the NaphCare defendants and Koren disagree as to what constitutional standard should apply in analyzing his excessive force claims. Second, regardless of which constitutional standard applies, the individual NaphCare Defendants argue that they cannot be liable because they played no role in placing Koren in the restraint chair. Third, the individual NaphCare Defendants argue that, even if liability could attach merely because they *kept* Koren in the restraint chair, Koren's detention under their watch never rose to the level of a constitutional violation. The Court addresses each of these issues below.

8

### 1. An Objective Standard Applies To Koren's Excessive Force Claims.

As a threshold matter, the parties dispute what constitutional standard applies in evaluating Koren's excessive force claims against the individual NaphCare Defendants. The NaphCare Defendants argue that these claims arise under the Eighth Amendment's Cruel and Unusual Punishments Clause, and thus, "the core judicial inquiry is whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." (12(b)(6) Reply, Doc. 13, #97 (modifications omitted)). Koren argues otherwise, asserting that his claims arise under the Fourteenth Amendment's Due Process Clause. Thus, he says, the appropriate standard is whether the use of the restraint chair "was objectively unreasonable under the circumstances." (12(b)(6) Opp'n, Doc. 11, #69).

As the Sixth Circuit recently observed, "[p]ersons in the criminal justice system invoke different constitutional amendments in their 42 U.S.C. § 1983 suits depending on their status." *Hale v. Boyle Cnty.,* 18 F.4th 845, 852 (6th Cir. 2021). For example, "[a]rrested persons bring § 1983 claims under the Fourth Amendment's protection from unreasonable search and seizure." *Id.* On the other hand, "[d]etained persons … do so under the Fourteenth Amendment's Due Process Clause." *Id.* Finally, "convicted persons [bring claims] under the Eighth Amendment's protection from cruel and unusual punishment." *Id.*

Depending on which Amendment applies, courts apply different analytical frameworks to evaluate the plaintiff's excessive force claims. When courts examine an arrested person's claims under the Fourth Amendment, or a pretrial detainee's

9

claims under the Fourteenth Amendment, they apply a "wholly objective standard"—that is, they ask whether the use of force was objectively unreasonable. *Id.* On the other hand, when courts examine a post-conviction offender's claim under the Eighth Amendment, they invoke a test with both objective and subjective components, the latter of which asks whether force was applied maliciously and sadistically to cause harm. *Id.*

Here, Koren was not a post-conviction offender at the time of the incident—thus, the Court rejects the NaphCare Defendants' argument that the Eighth Amendment's malicious-and-sadistic framework applies. Strictly speaking, though, Koren is also incorrect in arguing that he was a pretrial detainee. The Sixth Circuit has observed that, for persons arrested without a warrant, the "dividing line between the Fourth and Fourteenth Amendment zones of protection [is] the probable-cause hearing." *Guy v. Metro. Gov't of Nashville,* 687 F. App'x 471, 474 n.3 (6th Cir. 2017) (quoting *Aldini v. Johnson*, 609 F.3d 858, 867 (6th Cir. 2010)). At the time of the incident Koren describes in his Complaint, he had been arrested without a warrant, but had not yet appeared for his probable-cause hearing. (*See* Compl., Doc. 1). Thus, he was an arrestee for the purposes of analyzing his excessive force claim. That said, the distinction ultimately matters little, as the same objective standard applies to Koren's excessive force claim whether he was an arrestee or pretrial detainee. *Hale,* 18 F.4th at 852.

Under that standard, the question is not, as the NaphCare Defendants suggest, whether the individual NaphCare Defendants acted "maliciously and

sadistically to cause harm." Rather, the question is whether the use of force was "objectively unreasonable." *Phillips v. Curtis,* 765 F. App'x 130, 131 (6th Cir. 2019) (citing *Graham v. Connor,* 490 U.S. 386, 396 (1989)). Thus, that is the standard the Court applies.

### 2. An Excessive Force Claim Does Not Require That The Defendants *Placed* Koren In The Restraint Chair.

The individual NaphCare Defendants separately argue that Koren's claims must fail because Graham, Hale, and Taylor were not involved in—or even present during—the decision to *place* Koren in the restraint chair. (12(b)(6) Reply, Doc. 13, #97). Absent some showing that these individuals played some role in initially restraining Koren, the individual NaphCare Defendants argue, the excessive force claims against them cannot proceed.

That is not so. The argument itself rests on the apparent belief that a § 1983 excessive force claim necessarily involves some element of assault. That is, when a restraint chair is used, the individual NaphCare Defendants argue that it is the act of grabbing a plaintiff, forcing him to sit, and binding his limbs—or whatever form of inappropriate physical contact it may be—that gives rise to a cognizable excessive force claim. And here, the individual NaphCare Defendants were not involved in that initial physical contact with Koren in any way. Rather, when Koren reached them, he was already restrained the chair. Thus, they themselves did not engage in any kind of physical assault upon Koren at all.

The problem with their argument, though, is that the Sixth Circuit recently observed that "claims of excessive force do not necessarily require allegations of

assault, but rather can consist of the physical structure and conditions of the place of detention." *Moderwell v. Cuyahoga Cnty.*, 997 F.3d 653, 662 (6th Cir. 2021) (quoting *Burchett v. Kiefer*, 310 F.3d 937, 946 (6th Cir. 2002)) (internal quotation marks omitted). For example, in *Moderwell,* a detainee died after being subjected to the so-called "Red Zone," a system in which detainees were locked down for periods of twenty-seven hours or more in their cells, denied access to necessities like toilet paper, received no daily medical visits, and were not monitored on a regular observation schedule. *Id.* at 658. When the detainee's estate sued the defendant corrections officers for excessive force, the defendants moved to dismiss, arguing the complaint had not alleged assault upon the prisoner's person. *Id.* at 662. But the Sixth Circuit rejected that argument, explaining that the plaintiff could allege excessive force based merely on the defendants "*subjecting* [the detainee] to the horrible conditions of [the] Red Zone." *Id.* (emphasis added).

Similarly, in this case, Koren need not allege that the individual NaphCare Defendants actually exerted any direct physical force on him, at all. Rather, so long as the individual NaphCare Defendants unconstitutionally *subjected* Koren to the restraint chair (the Court addresses below what "subjected" means in this context), then Koren has stated a cognizable excessive force claim.

### 3. Even If The Individual NaphCare Defendants Subjected Koren To The Restraint Chair, Koren Has Failed To Adequately Allege That They Did So Unconstitutionally.

While Koren is correct that physical assault is not a necessary aspect of his excessive force claim, that does not get him all the way home. Rather, for his excessive

force claim to proceed beyond the pleading stage, he must adequately allege that the individual NaphCare Defendants: (1) actually *subjected* him to the restraint chair, and (2) did so in an unconstitutional manner.

As for the first question, the individual NaphCare Defendants argue that Koren has failed to plausibly allege that they subjected him to the restraint chair for the simple reason that Koren does not allege that any of them had the authority to release him. (12(b)(6) Mot., Doc. 3, #27). In other words, if they did not put him in the chair in the first instance (as noted above), and lacked authority to let him out, that means that they could not have "subjected" him to his restraint in the chair. Koren disagrees, and suggests that the individual NaphCare Defendants subjected him to the restraint chair merely because they could have taken some steps—perhaps *any* steps—to assist him, but failed to do so.[5] (12(b)(6) Opp'n, Doc. 11, #70–71).

The Court need not reach that issue here, though, as even if Koren has adequately alleged that the individual NaphCare Defendants subjected him to the

---

[5] In terms of the individual NaphCare Defendants' actual authority, Koren submits with his Opposition an excerpt of an interview with Hamilton County Sergeant Fritz Elsasser. (12(b)(6) Opp'n, Doc. 11, #72). In that interview, "Sgt. Elsasser told the Hamilton County Sheriff's Internal Affairs investigator … that only medical personnel can determine when an inmate may be released from a restraint chair." (*Id.* at #71). That would suggest that, contrary to their argument here, the individual NaphCare Defendants in fact did have authority to release him.

At the same time, though, as a general matter, "a court evaluating a motion for judgment on the pleadings (or a motion to dismiss) must focus only on the allegations in the pleadings …. This rule applies just as much when the plaintiff attaches evidence to its opposition as when (as is more common) the defendant attaches evidence to its motion." *Bates v. Green Farms Condo. Ass'n*, 958 F.3d 470, 483 (6th Cir. 2020). Accordingly, the Court declines to consider the Elsasser interview excerpt in adjudicating the instant Motion to Dismiss.

13

restraint chair, his claim nonetheless fails as he has not adequately alleged that they did so in an unconstitutional manner.

On that front, as noted above, Koren is an arrestee and thus the Court analyzes his excessive force claim under the Fourth Amendment's objective standard. *Phillips,* 765 F. App'x at 131. That is, the Court evaluates whether Koren has adequately alleged that the individual NaphCare Defendants' use of force was not objectively reasonable under the circumstances. *Hale,* 18 F.4th at 852. In determining whether the use of force was objectively reasonable, factors a court may consider include, but are not limited to, "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley v. Hendrickson,* 576 U.S. 389, 397 (2015). Importantly, however, courts must tailor their analysis to "the facts and circumstances of each particular case as viewed from the perspective of a reasonable officer on the scene, including what the officer knew at the time." *Moderwell,* 997 F.3d at 662 (citation and internal quotation marks omitted).

Courts in the Sixth Circuit have repeatedly recognized that jail officials may constitutionally employ restraint chairs to control arrestees and pretrial detainees— at least, when doing so is warranted under the circumstances. Indeed, the Sixth Circuit has observed that, in the Fourth Amendment context, "pepper spray, Tasers, arm bars, restraint devices, spit hoods, etc. all have their legitimate place." *Jennings*

*v. Fuller*, 659 F. App'x 867, 871 (6th Cir. 2016) (collecting cases). For example, in *Howell v. NaphCare,* this Court found that officials reasonably used a restraint chair to gain control over an inmate they believed was having a violent psychiatric episode. No. 1:19-cv-373, 2021 WL 5083726, at *12 (S.D. Ohio Nov. 2, 2021) (finding that placing a detainee in a restraint chair for four hours "was an appropriate reaction to the [officials'] perception that [the inmate] was at risk of harming himself or others"). Similarly, in *Crace v. Efaw,* the court found that jail officials acted reasonably when they placed an intoxicated and combative inmate in a restraint chair after an altercation. No. 2:09-cv-551, 2012 WL 3962799, at *9–11 (S.D Ohio Sept. 10, 2012).

Of course, that is not to suggest that the use of restraint chairs on inmates is *always* constitutional. But it does show that the use of restraint chairs is not objectively excessive force, so long as their use is objectively reasonable based on the information available to a particular jail official defendant at the time.

Bearing those principles in mind, the Court discerns two possible arguments Koren might make as to the use of the restraint chair here. First, Koren might argue that the individual NaphCare Defendants were aware, based on secondhand knowledge from the intake officers, that his initial restraint served no legitimate purpose, and thus they should have released him as soon as he entered their care (assuming they had authority to do so, an issue that, as noted above, the Court declines to reach). Second, Koren may be arguing that, even if the individual NaphCare Defendants did not know that Koren's initial restraint was improper,

15

when they saw his "pleasant and relaxed" demeanor, (Compl., Doc. 1, #13), they should have known the chair was unnecessary.

The Court rejects each of these arguments. As to the first, in fairness to Koren, his Complaint at least suggests that *the intake officers* may have placed him in the restraint chair for retaliatory reasons after he voiced concerns about being held in the same facility as the men who tried to rob him. (Doc. 1, #11–12). And, if that is true (as the Court must assume for present purposes), then it is certainly possible Koren would have a cognizable excessive force claim against the officers who initially restrained him. But, as to the individual NaphCare Defendants, the critical inquiry is not why Koren *in fact* was placed the restraint chair, but rather why the individual NaphCare Defendants *thought* he was placed in the restraint chair. *See Moderwell,* 997 F.3d at 662. In other words, did they know whether he was placed in the restraint chair for retaliatory purposes, rather than for legitimate reasons?

On that key issue, Koren's allegations are simply too vague to state a cognizable excessive force claim against the individual NaphCare Defendants. For example, according to the Complaint, Nurse Graham believed Koren was in the restraint chair "because he refuse[d] a strip search for drugs." (Doc. 1, #12). Similarly, Nurse Hale allegedly noted that Koren had been "placed in [the] restraint chair in intake by intake correction officers for disorderly behavior." (*Id.* at #13).[6]

---

[6] Koren does not provide any allegations as to why Taylor believed he had been placed in the chair.

16

The Court cannot conclude based on these vague allegations alone that the individual NaphCare Defendants were on notice that the use of a restraint chair was objectively unnecessary or inappropriate. Numerous courts in this Circuit have recognized that prison officials may use restraint chairs when arrestees and pretrial detainees pose a threat to themselves or others. *See, e.g.*, *Howell,* 2021 WL 5083726, at *12; *Degolia v. Kenton Cnty.,* 381 F. Supp. 3d 740, 759–60 (E.D. Ky. 2019); *Crace,* 2021 WL 3962799, at *9–11. The plausible inference from Koren's allegations is that the individual NaphCare Defendants reasonably believed that the intake officers had restrained Koren because he physically resisted being searched, thus rendering use of a restraint chair reasonable. At the very least, Koren's Complaint fails to "make sufficient factual allegations that, taken as true," raise a plausible inference that the individual NaphCare Defendants in fact knew that Koren had been placed in the chair for retaliatory, rather than objectively reasonable, reasons. *See Darby,* 964 F.3d at 444 (requiring that the complaint state a "plausible" claim).

Koren may instead be arguing, though, that even if the individual NaphCare Defendants did not know he had been improperly restrained in the first instance, the Constitution nonetheless obliged them to release him once they recognized that he was calm. On that front, for example, the Complaint alleges that Nurse Hale cared for Koren for approximately two hours after he first arrived in the jail's psychiatric facility. (Doc. 1, #13). During that time, Nurse Hale allegedly noted that Koren was "alert, responsive to questions, pleasant, and relaxed." (*Id.*). Koren also states that, during his last half hour in the restraint chair, Medic Taylor also observed Koren and

17

noted that he was "pleasant" and "relaxed" as well. (*Id.* at #14). To the extent Nurse Graham took note of Koren's demeanor, it is not mentioned in his Complaint. Nonetheless, because Koren's calm demeanor clearly demonstrated to Hale and Taylor that the chair was unnecessary, Koren argues, they should have taken steps to release him—and by failing to do so, they became liable for excessive force. (12(b)(6) Opp'n, Doc. 11, #75–76).

Again, Koren's argument is unpersuasive. As previously discussed, courts in this Circuit have recognized that officials may legitimately use restraint chairs to give violent or aggressive inmates an opportunity to calm down and ensure they pose no threat to others. These cases do not suggest that the officials have a constitutional obligation to immediately remove an inmate from a restraint chair as soon as that inmate has momentarily quieted, nor has the Court identified any case law to that effect. Moreover, because it would likely be difficult for jail officials to discern whether an inmate is experiencing a momentary pause in his or her aggressive behavior or instead has genuinely calmed, such a requirement would be impractical and unreasonable. Accordingly, it follows that if an inmate was reasonably placed in a restraint chair, officials may also reasonably leave him or her restrained for at least some period *after* he or she has apparently calmed.

For example, while admittedly an out-of-circuit case, the Eleventh Circuit has observed, "[t]he Constitution does not require prison officials to release from restraint a dangerous inmate who has lashed out at them simply because he has stopped lashing out for the time being." *Scroggins v. Davis*, 346 F. App'x 504, 506 (11th Cir.

18

2009). Indeed, the Eleventh Circuit reasoned that because "four-point restraints make it difficult for an inmate to engage in any kind of physical misbehavior," a requirement that prison officials immediately release any inmate who stops lashing out "would mean that four-point restraints could never be continued for longer than a few minutes at a time." *Id.* That is not the rule. Rather, "[h]ow long restraint may be continued calls for the exercise of good judgment on the part of prison officials," and courts are to give "great deference" to prison officials in making that call. *Williams v. Burton*, 943 F.2d 1572, 1576 (11th Cir. 1991).

This Court recognized a similar principle in *Howell*. There, jail officials placed an inmate in a restraint chair because his behavior—including yelling, rolling on the floor, and fighting his cellmate—led the officials to believe he was having a psychiatric episode. 2021 WL 5083726, at *12. This Court held that the officials acted reasonably in leaving the inmate in the chair for less than four hours, even after the inmate had apparently calmed, explaining that the Constitution must allow for "some reasonable interval between an inmate's cessation of behaviors justifying use of the restraint chair and the detainee's release from the chair." *Id.* at *13. Likewise, in *Stanfill v. Talton*, jail officials placed an inmate in a restraint chair out of concern that he posed a risk of self-harm. 851 F. Supp. 2d 1346, 1374 (M.D. Ga. 2012). The Court rejected a claim that the jail officials should have released the inmate as soon as he showed signs of calming down, because "the particular circumstances confronting the officers justified the continued use of the restraints until they were reasonably assured that the situation had abated." *Id.* To be sure, the exact endpoint

19

for "reasonable" use of a restraint chair after an inmate's behavior has changed may be subject to debate, but resolving that issue, as with many aspects of jail operations, involves substantial deference to jail officials.

Applying those principles here, Koren's argument fails. As discussed above, Koren fails to adequately allege that the individual NaphCare Defendants knew that the initial decision to restrain him was retaliatory, rather than because he had engaged in threatening or hostile behavior. And, assuming that they understood he had engaged in such behavior, under cases like *Howell* and *Scroggins*, it did not constitute excessive force for the individual NaphCare Defendants to leave Koren in the chair for a few hours after he had calmed down to ensure that he posed no threat to himself or anyone else at the jailhouse. Accordingly, absent facts plausibly establishing that the individual NaphCare Defendants knew he had been placed in a restraint chair for retaliatory purposes, rather than disruptive behavior, the Court finds that Koren has failed to state plausible claims against the individual NaphCare Defendants and **DISMISSES** all counts against them **WITHOUT PREJUDICE**.

## B. Koren's *Monell* Claim Against NaphCare Fails Because Koren Fails To Allege Both An Underlying Constitutional Violation By A NaphCare Employee And Any Unconstitutional Actions Taken By NaphCare.

The NaphCare Defendants also move to dismiss Koren's § 1983 claim against NaphCare Inc. itself. As the Sixth Circuit recently observed, in the § 1983 context, a plaintiff can establish *Monell* liability against a municipal government or private company by "demonstrating: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision-making authority ratified illegal

20

actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Gardner v. Lexington-Fayette Urb. Cnty. Gov't*, No. 21-5941, 2022 U.S. App. Lexis 6140, at *5 (6th Cir Mar. 9, 2022). Moreover, "[i]n addition to identifying conduct properly attributable to the [government entity or company], a plaintiff must show that the [government entity or company] was a moving force behind the alleged violation." *North v. Cuyahoga Cnty.*, 754 F. App'x 380, 386 (6th Cir. 2018) (internal quotation marks and citations omitted). Stated differently: regardless of which theory of *Monell* liability the plaintiff pursues, he or she must demonstrate a causal connection between the municipal entity or company's conduct and the deprivation alleged.

Here, Koren's claim against NaphCare fails for two reasons. First, "[t]here can be no liability under *Monell* without an underlying constitutional violation." *Sensabaugh v. Halliburton,* 937 F.3d 621, 630 (6th Cir. 2019) (quoting *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014)). That is, a plaintiff must first identify an employee who committed the constitutional violation, before seeking to use *Monell* to impose liability on the employer for that violation.

Here, the Court has already dismissed Koren's excessive force claims against all the named NaphCare employees in this case—thus, those claims cannot provide an underlying violation to support Koren's *Monell* claim against NaphCare. And while Koren's Complaint also includes allegations against other unnamed NaphCare employees, those allegations are not substantively different from the allegations

21

against the named ones. (*See* Compl., Doc. 1, #13–15). Thus, because the Court finds that Koren's allegations against the named NaphCare employees cannot establish an underlying constitutional violation, Koren's allegations against the unnamed NaphCare employees likewise fail to do so, meaning the necessary predicate for any *Monell* claim is lacking.

Separately, even if the Court could discern some underlying constitutional violation by a NaphCare employee in Koren's Complaint, Koren would also need to show that this alleged violation was caused by some action that NaphCare itself took. And on that front, the NaphCare Defendants persuasively argue that Koren's Complaint "fails to set forth any facts indicating that a NaphCare policy, custom or procedure led to the alleged constitutional violation. In fact, [Koren] does not describe any policy, custom or procedure of NaphCare itself in the Complaint." (12(b)(6) Mot., Doc. 3, #29).

In his Opposition, Koren notes that his Complaint states that "NaphCare enacted policies or pursued customs related to restraint chairs which were deliberately indifferent to the rights of individuals such as Mr. Koren, resulted in excessive force, the denial of Due Process, and failed to adequately train and supervise the use of such devices." (12(b)(6) Opp'n, Doc. 11, #77 (quoting Compl., Doc. 1, #16)). Moreover, the Complaint also states that "Mr. Koren was placed and held in the restraint chair as a direct and proximate result of these policies or customs." (*Id.* (quoting Compl., Doc. 1, #17)). Thus, Koren's Opposition argues that "[t]he complaint … specifically pleads that NaphCare's polices, and customs concerning the restraint

chair [caused] Mr. Koren to be unlawfully restrained in the chair and therefore deprived of his constitutional rights. For purposes of [Federal Rule of Civil Procedure] 12, nothing more is required of the Plaintiff during this stage of the litigation." (*Id.* at #77–78).

That isn't quite right. As the Sixth Circuit has explained, in order to assert a § 1983 claim against a local government entity or private corporation, a Complaint must "adduce[] … evidence that … a policy or practice existed" that led to the deprivation at issue. *Page v. City of Monroe*, 24 F. App'x 249, 251 (6th Cir. 2001). For example, in *Johnson v. City of Kentwood,* the Sixth Circuit found that the lower court properly dismissed a § 1983 claim against a municipality for failure to plead with sufficient factual detail. No. 20-1568, 2021 U.S. App. Lexis 7518 *8 (6th Cir. Mar. 15, 2021). As *Johnson* explained,

> [the plaintiff] did not allege specific facts showing that a custom or policy of the City caused any constitutional deprivation. He merely alleged, in conclusory fashion, that the City has a practice or custom of condoning, tolerating, and ratifying retaliation by its law enforcement officers against citizens who exercise their free-speech rights. Therefore, the [lower court] properly dismissed [the plaintiff's] claims against the City.

*Id.* Similarly, in *Rowland v. City of Memphis,* the Western District of Tennessee dismissed the plaintiff's § 1983 claim alleging that the defendant municipality had "failed to adequately train or supervise [its] officers and/or negligently encouraged [unlawful] behaviour by its policies and procedures." No. 2:13-CV-02040, 2013 WL 2147457, at *5 (W.D. Tenn. May 15, 2013). *Rowland* found that the plaintiff's allegations were "conclusory because they simply assume that an unlawful seizure or

disposal of property must be the result of the City's failure to train or the City's policies and procedures"—thus, the claims were appropriately dismissed. *Id.*

Much like in *Johnson* and *Rowland*, in this case, Koren attempts to rely on bare, conclusory assertions that NaphCare adopted policies or customs of unlawful conduct, without adducing any evidence necessary to survive a motion to dismiss. At most, he argues that the mere fact that the individual NaphCare Defendants subjected *him* to the restraint chair suggests that an underlying policy or custom tolerating such behavior or failing to train against it exists. But as *Rowland* makes clear, allegations "assum[ing] that [unlawful behavior] must be the result of [an entity's] failure to train or [its] policies or procedures" are plainly insufficient. *Id.* Accordingly, the Court **DISMISSES** Koren's claims against NaphCare **WITHOUT PREJUDICE**.

### THE COUNTY DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

In their Motion for Judgment on the Pleadings, the County Defendants (former Sheriff Neil and former Chief Deputy Sheriff Schoonover)[7] move to dismiss Koren's § 1983 claims against them in both their individual and official capacities. (12(c) Mot., Doc. 14, #101).

A plaintiff can sue a defendant under § 1983 in that defendant's individual capacity, official capacity, or both. As the label suggests, an individual-capacity claim

---

[7] The Court emphasizes that the term "County Defendants" in this Opinion refers solely to former Sheriff Neil and former Chief Deputy Sheriff Schoonover, who are named as parties in their official and individual capacities. "County Defendants" does not refer to any other county employees who are currently parties to this action.

is directed against the person him or herself, and the liability for the conduct extends only to that person. An official-capacity claim against a public employee under § 1983, by contrast, is really a claim against the individual's employer. In other words, an official-capacity claim against an individual amounts to a *Monell* claim against the individual's employer. *Curtis v. Breathitt Cnty. Fiscal Ct.,* 756 F. App'x 519, 525 (6th Cir. 2018) ("An official capacity claim filed against a public employee generally represents another way of pleading an action against the public entity that agent represents.") (citing *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)). So, for example, if a plaintiff were to sue a county law-enforcement officer in the officer's official capacity, that is for all intents and purposes a *Monell* suit against the county itself. *Graham*, 473 U.S. at 166 ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.").

The Court first addresses Koren's individual capacity claims against the County Defendants, before turning to his official capacity claims.

## A.    The Individual Capacity Claims Against The County Defendants Fail Because Koren Does Not Sufficiently Allege They Caused The Events At Issue.

First, Koren brings claims against the County Defendants in their individual capacities. Koren does not allege that either of the County Defendants were present in the jailhouse during his detention in the restraint chair. Rather, Koren brings his claims against former Sheriff Neil and former Chief Deputy Sheriff Schoonover under theories of supervisory liability. Specifically, Koren alleges first that Neil and Schoonover are individually liable because they "adopted and ratified" the findings of

25

the Internal Affairs investigation, which concluded that "the use of the restraint chairs during this incident was within the guidelines of the Hamilton County Policy and Procedure." (Compl., Doc. 1, #15). Second, Koren alleges that Neil is also individually liable because he "failed to adequately train and supervise" his employees regarding the use of strip searches and restraint chairs; Neil also "enacted policies and pursued customs" related to the use these devices which were "deliberately indifferent to the rights of individuals such as Mr. Koren." (*Id.* at #15–16). In the Court's view, neither of these theories of individual liability are persuasive.

Let's start with supervisory liability. "Generally, the doctrine of respondeat superior does not apply in § 1983 lawsuits to impute liability onto supervisory personnel." *Farmer v. Phillips*, No. 20-5730, 2021 WL 6210609, at *2 (6th Cir. Oct. 19, 2021) (citing *Polk Cnty. v. Dodson*, 454 U.S. 312, 325 (1981)); *see also Winkler v. Madison Cnty.,* 893 F.3d 877, 898 (6th Cir. 2018) (citing *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984)). Rather, individuals sued in their personal capacity under § 1983 are liable only for their *own* unconstitutional behavior. *See Murphy v. Grenier*, 406 F. App'x 972, 974 (6th Cir. 2011). That is not to say that a supervisor is never liable unless he or she directly participates in the incident. But to establish that a supervisor is liable, the Sixth Circuit has held that the plaintiff must show, at the very least, "that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it." *Sexton v. Cernuto*, 18 F.4th 177, 185 (6th Cir. 2021) (quoting *Doe v. Claiborne Cnty.*, 103 F.3d 495, 511 (6th Cir. 1996)).

Moreover, supervisory liability will not attach based on a "a mere failure to act." *Crawford v. Tilley*, 15 F.4th 752, 762 (6th Cir. 2021).

In this case, Koren first argues that Neil and Schoonover are individually liable under a supervisory theory because they each "ratified" their subordinates' allegedly unconstitutional conduct by adopting the conclusions of the Internal Affairs investigation. The Court struggles to find in these allegations the "direct participation" in the "specific incident of misconduct" that is necessary to make Neil or Schoonover liable in their individual capacities under § 1983. Indeed, in *Frodge v. City of Newport*, the plaintiffs brought a similar supervisory liability claim against three individual defendants. 501 F. App'x 519 (6th Cir. 2012). The plaintiffs alleged that the defendants "ratified [their subordinate's] conduct by failing to investigate the incident and failing to discipline [the subordinate] for making an invalid arrest and using excessive force." *Id.* at 532. The Sixth Circuit rejected this argument, finding that the plaintiff's allegations were "insufficient to make supervisors liable for their subordinates' conduct. Plaintiffs must present evidence that [the supervisor-defendants] 'did more than play a passive role in the alleged violation …. Supervisory liability under § 1983 cannot attach where the allegation of liability is based upon a mere failure to act.'" *Id.* (quoting *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999)); *see also Day v. DeLong*, 358 F. Supp. 3d 687, 704 (S.D. Ohio 2019) ("Even if Plummer or DeLong had violated Plaintiff's constitutional rights, Day's supervisory liability claims would still fail, since mere 'ratification' of conduct by failing to investigate the incident and failing to discipline for making an invalid arrest and

27

using excessive force is insufficient to make supervisors liable for their subordinates' conduct."). But that sort of "passive role" is exactly what Koren points to here in terms of the alleged "ratification." Accordingly, to the extent Koren relies on Neil and Schoonover's "ratification" of the Internal Affairs investigation as a basis to establish individual liability, the Court rejects that argument.

Koren also brings an individual capacity claim against Neil based on his adoption of unconstitutional policies or customs related to the use of restraint chairs and strip searches. As Koren explains, during his tenure as Sheriff, Neil "enacted policies and pursued customs related to [strip searches and restraint chairs] which were deliberately indifferent to the rights of individuals such as Mr. Koren, resulted in excessive force, the denial of Due Process, and failed to adequately train and supervise the use of such devices." (Compl., Doc. 1, #15–16).

In their Motion, the County Defendants argue that Koren cannot assert a § 1983 individual capacity claim against Neil based on his role in instituting allegedly unconstitutional policies or customs. As the County Defendants explain, Koren's "allegations regarding the creation and implementation of policies of customs asserted against Neil relate to his former status as the elected Sheriff of Hamilton [County] …. [These] allegations, if properly pled, equate to claims against the office of the sheriff and by extension against the political subdivision of Hamilton County. They do not inure to or compromise the individual and personal assets of Defendant[] Neil …." (12(c) Mot. Doc. 14, #109).

28

The Court need not reach the merits of the County Defendants' argument on this point, however, because it finds that—even assuming a supervisor *can* be held liable in his individual capacity based on his role in instituting customs or policies, Koren's factual allegations are too threadbare to support such a claim. Koren alleges that he was held in the restraint chair pursuant to then-Sheriff Neil's policies or customs, which

> utilize[d] restraint chairs liberally, punitively, and in ways which served no reasonable penological interest, particularly during the intake process. Public records reveal that hundreds of citizens every year are placed in a restraint chair in the HCJC in much the same manner as Mr. Koren. Most of these citizens were deemed to have been nothing more than "uncooperative."

(Compl., Doc. 1, #16).

As previously discussed, to survive a motion for judgment on the pleadings, a plaintiff "must make sufficient factual allegations that, taken as true, raise the likelihood of a legal claim that is more than possible, but indeed plausible." *Darby*, 964 F.3d at 444. Thus, to the extent that Koren alleges that Sheriff Neil instituted an unlawful policy concerning the use of restraint chairs, that claim fails because Koren "identifies no document, policy directive, or anything else that would constitute [department] policy." *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 373 (6th Cir. 2011).

In the alternative, Koren perhaps may be alleging that Sheriff Neil instituted a custom of tolerating federal rights violations. But if Koren is in fact pursuing a "custom of inaction" theory, that claim likewise fails as a matter of law, as the Sixth Circuit has held that such a theory requires—among other elements—"the existence

of a clear and persistent pattern of illegal activity." *Thomas v. City of Chattanooga,* 398 F.3d 426, 430 (6th Cir. 2005) (modifications omitted).

Here, although Koren alleges that restraint chairs were employed *prolifically* during Sheriff Neil's tenure, this does not itself allow the Court to plausibly infer that these chairs were being used *unlawfully.* As noted, the Sixth Circuit has recognized that restraint chairs may be constitutionally employed for legitimate penological purposes. *See, e.g.*, *Jennings*, 659 F. App'x at 871. Although Koren alleges that, in most cases where HCJC officials used restraint chairs, the inmates being restrained "were deemed to have been nothing more than 'uncooperative,'" that allegation provides little assistance here, as the term "uncooperative" is not only wholly conclusory, but also covers such a wide range of behavior (from passively lying on a bunk after being instructed to move, to punching a corrections officer) that the Court cannot plausibly infer that the chairs were being used in an unconstitutional manner in response to that "uncooperative" behavior. (Compl., Doc. 1, #16).

Because the Court finds Koren has failed to adequately allege that Sheriff Neil adopted an unconstitutional policy or custom with regard to the use of restraint chairs, any personal capacity claim against Sheriff Neil arising from such a policy or custom must fail. For these same reasons, the Court also rejects as conclusory Koren's allegations that Sheriff Neil adopted unconstitutional policies or customs with regard to the use of strip searches. Accordingly, the Court **DISMISSES** all individual capacity claims against Neil and Schoonover **WITHOUT PREJUDICE**.

**B.** **Koren's Official Capacity Claims Against The County Defendants Fail Because He Has Not Identified A Policy Or Actionable Ratification.**

Koren also brings claims against the County Defendants in their official capacities. As noted above, these are properly analyzed under *Monell.* To establish that a local government is liable under § 1983, a plaintiff must "demonstrat[e]: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision-making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Gardner,* 2022 U.S. App. Lexis 6140, at *5. Regardless of which theory the plaintiff pursues, however, the plaintiff must demonstrate that the local government's conduct was a "moving force behind the alleged violation." *North,* 754 F. App'x at 386.

Here, Koren attempts to establish Hamilton County's liability in two ways. First, he argues that then-Sheriff Neil enacted customs or policies regarding the use of restraint chairs and strip searches "which were deliberately indifferent to the rights of individuals such as Mr. Koren." (Compl., Doc. 1, #15–17). However, as the Court explained above, Koren fails to plausibly allege the existence of any particular custom or policy here (for example, an official policy document or a pattern of repeated constitutional violations). Absent such factual allegations, Koren's argument on this front cannot succeed.

Second, Koren alleges that the County is liable because Neil and Schoonover, as officials with final decision-making authority, ratified their subordinates' illegal actions by adopting the results of the Internal Affairs investigation. (*Id.* at #15). The

Court is not persuaded. Koren's argument here is strikingly similar to the one the Sixth Circuit recently rejected in *Kirk v. Calhoun County*, Nos. 19-2456/20-1365, 2021 WL 2929736, at *7 (6th Cir. Jul. 12, 2021). There, the plaintiff attempted to hold a county liable based on allegations that the county sheriff "'ratified' what [the plaintiff] allege[d] was an inadequate investigation into [a] citizen complaint" regarding unconstitutional activity by county officials. *Id.* While the plaintiff in that case described his § 1983 claim in terms of "ratification," the Sixth Circuit found it was properly interpreted as a custom-of-tolerance claim. *Id.* Thus construed, the Sixth Circuit rejected the plaintiff's claim, stating that "[t]o prove a 'custom-of-tolerance' theory of liability, a plaintiff must show that there was a pattern of inadequately investigating similar claims. Without such evidence, there is no demonstration of causation to show that the allegedly inadequate investigation caused the constitutional violation in question." *Id.* (internal quotation marks and citations omitted).

Much like in *Kirk,* Koren fails to adequately allege "a pattern of inadequately investigating" claims similar to his own. While he alleges that hundreds of citizens each year are placed in restraint chairs at the HCJC, (Compl., Doc. 1, #16), he does not allege facts showing that they are placed in the restraint chairs unconstitutionally, or that any of these incidents resulted in similarly inadequate investigations. Without such a showing, "there is no demonstration of causation to show that the allegedly inadequate investigation caused the constitutional violation

in question." *Kirk*, 2021 WL 2929736, at *7 (quoting *David v. City of Bellevue*, 706 F. App'x 847, 853 (6th Cir. 2017)).

Accordingly, the Court **DISMISSES** Koren's claims against Neil and Schoonover in their official capacities **WITHOUT PREJUDICE**.

## CONCLUSION

For the foregoing reasons, the Court the Court **GRANTS** the NaphCare Defendants' Motion to Dismiss (Doc. 3) and accordingly **DISMISSES** all claims against Katrina Hale, Mark Taylor, Darlene Graham, and NaphCare **WITHOUT PREJUDICE**. Further, the Court **GRANTS** the County Defendants' Motion for Judgment on the Pleadings (Doc. 14) and **DISMISSES** all official and individual capacity claims against Jim Neil and Mark Schoonover **WITHOUT PREJUDICE**.

**SO ORDERED.**

March 31, 2022
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**